**John BRADAS et al.,**
**Plaintiffs-Appellees,**

v.

**RAPIDES PARISH POLICE JURY et al., Defendants-Appellants,**

**Louis Berry et al.,**
**Intervenors-Appellees.**

**No. 74–2422.**

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1975.

Rehearing and Rehearing En Banc
Denied March 19, 1975.

James J. Brady, Camille F. Gravel, Jr., Edwin O. Ware, Dist. Atty., Alfred B. Shapiro, Asst. Dist. Atty., Alexandria, La., for Rapides Parish Police Jury, and others.

J. Michael Percy, Louis Berry, Alexandria, La., for plaintiffs-appellees.

Richard B. Millspaugh, Opelousas, La., for intervenors.

Before GEWIN and SIMPSON, Circuit Judges, and NICHOLS *, Associate Judge.

SIMPSON, Circuit Judge:

By a judgment rendered May 1, 1974, amended and supplemented May 10, 1974, the district court struck down as violative of the Fifteenth Amendment to the Constitution a reapportionment plan (the Le Blanc plan) for the Rapides Parish Police Jury and School Board he had both instituted and approved three years earlier.[1] The May, 1974 judgment[2] is the subject of the instant appeal by the Rapides Parish Police Jury and School Board. That judgment, after nullifying the Le Blanc plan, adopted a substitute plan, discussed in detail hereinafter, and provided that the terms of the then current members of the Police Jury and School Board should terminate upon the commissioning of their successors.

Under the Le Blanc plan the eleven wards[3] of Rapides Parish were divided into one single-member and three multi-member districts for the purpose of electing 18 officers to the parish police jury as well as to the parish school board.[4] The Le Blanc plan separated the parish as follows: District "A" consisted of Wards 1 and 8 with a combined population of 64,649 and was to elect 10 members to each body; District "B" consisted of Wards 9, 10 and 11 with a combined population of 33,300 and was to elect 5 members to each body; District "C" consisted of Wards 2, 3, 4 and 6 with a combined population of 14,073 and was to elect 2 members; and District "D" consisted of Wards 5 and 7 with a combined population of 6,236 and was to elect a single member to each body. The population figures are taken from the 1970 Federal Census. The plan also contained residency requirements for the elected officials. For example, in District A, 8 of the 10 members were required to reside in Ward 1 and the other 2 were required to reside in Ward 8.

Of Rapides Parish's 118,078 residents 27.9% or 32,975 are black, with most of the blacks residing in Alexandria, population 64,650, the only sizable city in the parish. The relatively concentrated population of Alexandria fills Ward 1 and a portion of Ward 8. Standing alone, Ward 1 is 42% black and 58% white. When combined with Ward 8 to form District A, however, the percentages change to 37% black and 63% white. No

---

* Of the United States Court of Claims, sitting by designation.

1. By an unreported judgment of July 26, 1971 in a prior suit entitled Le Blanc et al. v. Rapides Parish Police Jury et al., Civil Action No. 13,715.

2. Entered in a later suit entitled Bradas et al. v. Rapides Parish Police Jury et al., 376 F.Supp. 690.

3. A ward is the basic territorial subdivision of Rapides Parish and other Louisiana parishes, which correspond to counties elsewhere.

4. Both the police jury and the school board are representative bodies with their members elected by parish voters pursuant to territorial areas or districts established either by the Louisiana Legislature or by the police jury itself. The police jury functions pursuant to Article 14 Section 3 of the Louisiana Constitution essentially as the parish legislature, but also historically has performed various administrative functions such as maintenance and construction of roads, bridges and public buildings. The school board was established pursuant to Article 12 Section 10 of the Louisiana Constitution. It operates the public schools of the parish.

black has ever been elected to serve on the parish police jury or school board.

Approximately one year subsequent to the Le Blanc plan's judicial implementation, the United States brought suit in the district court seeking to nullify the plan because it lacked the prior approval of the Attorney General of the United States pursuant to Section 5 of the Voting Rights Act of 1965, Title 42, U.S.C., § 1973c. The district judge dismissed that suit holding that "Section 5 does not require prior approval of reapportionment plans submitted to a United States District Court in the trial of an adversary proceeding." United States v. Rapides Parish School Board et al., Civil Action Number 19,209 W.D.La., October 25, 1973. In footnote 1 to that opinion-order, the trial judge made it clear that during the course of the Le Blanc suit he was cognizant of Fifteenth Amendment rights and considered them at various times throughout the proceedings.[5]

The present suit was filed by ten parish citizens, both blacks and whites, alleging that the Le Blanc plan violates the "one man-one vote" rule and results in dilution of the black vote in contravention of the Fifteenth Amendment. Five unsuccessful black candidates for parish office, Louis Berry and others, intervened, generally supporting plaintiffs' claims. Concentrating on their dilution claim, plaintiffs/intervenors/appellees pointed out that no black has ever been elected to a parish office; that the strength of the black vote in Ward 1 was diluted by the Le Blanc plan from 42% to 37% by combining it with Ward 8 to form District A; that a Ward 8 candidate can be elected on the strength of Ward 1's vote and will therefore be more

responsive to Ward 1; and that the political process is not as open and free as possible because the size of Ward 1 makes it relatively expensive for a young candidate with moderate means to run for parish office, thus placing him at a serious disadvantage.

·The district court found by its May 1974 judgment that the July 26, 1971 judgment adopting the Le Blanc Plan did not sufficiently consider Fifteenth Amendment rights, though such rights were represented in the prior suit, and nullified that plan. The court proceeded to implement its own reapportionment scheme which divided the parish into nine single member election districts. The effect of this new plan is to cut by 50% the number of officials elected to each parish body from eighteen to nine. The police jury and school board moved the district court to set aside its judgment and grant a new trial. Upon denial of that motion, this appeal followed.

Appellants urge three major contentions on appeal: (a) that the Fifteenth Amendment issue dealing with alleged dilution of the black vote had been previously ruled upon by the district court thus making applicable the doctrine of res judicata; (b) that the appellees failed to sustain their burden of proof as to their Fifteenth Amendment claim in accordance with the standards and guidelines established in White v. Regester, 1973, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, and its progeny; and (c) that the district court exceeded its authority by ordering a new reapportionment plan requiring a 50% reduction in the number of officials elected to parish office in contravention of Sixty-Seventh

---

5. Footnote 1 read in full:

1. The Le Blanc suit was brought by two plaintiffs, one of whom was black. Two of the three lawyers representing plaintiffs were blacks. *Although Fifteenth Amendment rights were not specifically mentioned in the complaint,* an examination of the record will exhibit that *they were present and considered by the court at various times throughout the proceeding.* Although the Attorney General could have intervened in Suit No. 13,715 from the date of its filing on April 15, 1968 to the

date of its termination in June of 1972, he did not choose to do so.

Civil Action No. 19,190 entitled "John Bradas, et al v. Rapides Parish Police Jury, et al" was filed in the Western District of Louisiana on July 17, 1973. It is the suit for reapportionment in which Fourteenth and Fifteenth Amendment rights are specifically at issue. The Attorney General has admitted knowledge of this suit but has not intervened. (emphasis added).

Minnesota State Senate v. Beens, 1972, 406 U.S. 187, 92 S.Ct. 1477, 32 L.Ed.2d 1. Since we find merit in appellants' second contention, regarding the burden of proof, we do not reach the other two points raised.

Allegations of dilution of minority voting strength are not new to this Court. See Reese v. Dallas County, Alabama, 5 Cir. 1974, 505 F.2d 879; Turner v. McKeithen, 5 Cir. 1973, 490 F.2d 191; Zimmer v. McKeithen, 5 Cir. 1973, 485 F.2d 1297 (en banc decision reversing 5 Cir. 1972, 467 F.2d 1381). Following the mandate of the Supreme Court in White v. Regester, 1973, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, we have consistently recognized that "access to the political process and not population (is) the barometer of dilution of minority voting strength." Reese, supra, 505 F.2d at 882; Turner, supra, 490 F.2d at 193–194; Zimmer, supra, 485 F.2d at 1303. Plaintiffs' burden, then, "is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." White v. Regester, supra, 412 U.S. at 766, 93 S.Ct. at 2339. It is in the failure to meet this burden that we find appellees' proof fatally deficient.

In Turner we set forth a number of factors drawn from White and Zimmer relevant to a determination of whether a minority group actually lacks meaningful access to the political process:

"Among the factors entitled to consideration are the continuing effects of past discrimination on the minority group's ability to participate in the political process, the opportunity for the minority group to participate in the candidate selection process, the responsiveness of elected officials to the particular concerns of the minority group, and the strength of the state interest in multi-member or at-large voting.

Furthermore, both White v. Regester and Zimmer recognized that the presence of various structural voting devices such as a majority vote requirement, anti-single shot voting, large districts, and lack of residency requirements in a district or its geographical subdivisions may increase the potential for dilution under a multi-member or at-large arrangement. Dilution, as with so many complex factual determinations turns on an aggregation of the circumstances." (footnotes deleted) Turner, supra, 490 F.2d at 194.

Consideration of the evidence below in the light of these factors emphasizes the dearth of appellees' proof. Neither the record nor the district court's findings indicates difficulty on behalf of blacks in registering to vote, in choosing the political party they desire to support, in meaningfully participating in party activities, in qualifying as candidates for a desired office, in participating in the candidate selection process, or in participating meaningfully in any other portion of the political process. The record does not evidence a state policy favoring multi-member districts that is rooted in racial discrimination, nor does it indicate a lack of responsiveness on behalf of elected officials to the particular concerns of the black community.

The single glaring fact that no black has ever been elected to a parish office does not by itself support judicial nullification of a reapportionment plan. It evidences no more at the most than a policy of past discrimination. But the issue here of course is not whether Rapides Parish discriminated against blacks in the past, but rather whether any debilitating effects of that discrimination still persist. See Zimmer, supra, 485 F.2d at 1306. In previous cases such debilitating effects have usually been shown by a relatively large discrepancy between the size of the black population and the number of registered black voters, Zimmer, supra, 485 F.2d at 1306, or between the number of blacks registered to vote in federal elections and the number of

blacks registered to vote in state elections, *Turner,* supra, 490 F.2d at 195. A finding of continuing effects of past discrimination is not supported by any evidence in this record.

Likewise it does not suffice to show that the use of multi-member districts has diminished to some extent the proportion of blacks in the voting unit unless some evidence also demonstrates that such multi-member districts were "conceived or operated as purposeful devices to further racial or economic discrimination." Whitcomb v. Chavis, 1971, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363. To the same extent that the black proportional strength in Ward 1 is decreased by "tacking on" the substantially white Ward 8, the proportional strength of the blacks in Ward 8 has increased. While we have previously recognized that "such increases or decreases in proportional strength resulting from the change from one apportionment system to another may in some cases provide significant evidence of (discriminatory) motive or effect," *Turner,* supra, 490 F.2d at 196, the 5% decrease involved before us does not assume compelling significance.

"In Howard v. Adams County Board of Supervisors (5 Cir. 1972, 453 F.2d 455, 457) this court stated that to establish the existence of a constitutionally impermissible redistricting plan, plaintiffs must maintain the burden of showing either first, a racially motivated gerrymander, or a plan drawn along racial lines, or second, that '. . . designedly or otherwise, a(n) . . . apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' " *Zimmer,* supra, 485 F.2d at 1304. The district court found that appellees had sustained their burden, stating only that the "record of the Le Blanc suit (Court Ex. 1), the 1970 Census (Court Ex. 2), and the testimony of plaintiffs' witnesses, including the results of elections held under the Le Blanc Plan, clearly establish that the plan is unconstitutional." This sweepingly general finding is not supported by this record. In consequence the judgment appealed from is ordered vacated and this cause is remanded to the district court with directions to reinstate the Le Blanc Plan prior to the next election for Police Jury and School Board scheduled to be held in Rapides Parish.[6]

To prevent needless expense and confusion, the tenure in office of the present members of the Police Jury and School Board, elected under the 9 member plans of the May 1, 1974 judgment, shall not be disturbed in the interim.

Let our mandate issue immediately.

Vacated and remanded with directions.

---

**6.** We have examined the recent Supreme Court decision, Chapman v. Meier, 1975, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766, and determine that nothing said herein is inconsistent with the teachings of that case.