559 F.2d 1265
 T. J. HENDRIX et al., Individually and for all others
similarly situated, Plaintiffs-Appellees,
v.
William F. JOSEPH, Jr., Individually and in his official
capacity as Chairman of the Montgomery County
Commission, et al., Defendants-Appellants.
 No. 76-1725.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 12, 1977.
 
 Jack Crenshaw, W. Mark Anderson, III, Montgomery, Ala., for defendants-appellants.
 Pamela S. Horowitz, Jr., Morris S. Dees, Joseph J. Levin, Jr., Howard A. Mandell, Montgomery, Ala., for plaintiffs-appellees.
 Wm. Baxley, Atty. Gen., State of Ala., Montgomery, Ala., for State of Ala.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before AINSWORTH and RONEY, Circuit Judges, and ALLGOOD,* District Judge.
 RONEY, Circuit Judge:
 
 
 1
 The County Commission of Montgomery County, Alabama, is elected at-large by all the voters of the county. The black plaintiffs allege that this twenty-year-old practice dilutes their votes. The lack of consideration of, and sufficient factual findings on, several of the elements which are relevant to a claim of dilution require a remand, consistent with our recent decisions in David v. Garrison, 553 F.2d 923 (5th Cir. 1977); Paige v. Gray, 538 F.2d 1108 (5th Cir. 1976); and Nevett v. Sides, 533 F.2d 1361 (5th Cir. 1976).
 
 
 2
 The population of Montgomery County is approximately 170,000 and 36% of its residents are black. The county includes the city of Montgomery, which is the state capital and contains all but 35,000 of the persons living in the county. The city of Montgomery has its own government, which provides the full range of municipal services to the residents of the city. That government has no power outside the city limits. The needs of persons living in the other areas are taken care of by the County Commission, which consists of five Commissioners.
 
 
 3
 The county is divided into three districts, the northern, which contains the city of Montgomery, the southeastern and the southwestern. The population of the latter two is predominantly black, that of the urban northern district predominantly white. Prior to 1957 each district elected its own County Commissioner, with the northern district electing three. This meant that the rural southern portion of the county, with less than 7% of the population, was electing 40% of the membership of the Commission. In 1957 the Alabama Legislature passed Act 685, Ala.Code Appx., § 523(16.008) (1958), the effect of which was to transform the election of all five Montgomery County Commissioners into at-large contests. It required one Commissioner to reside in the southeastern district, one to reside in the southwestern district, and three to reside in the northern district. Each candidate was assigned a place on the ballot and thus was in a head-to-head race with a specific opponent for a specific seat on the Commission. Under Alabama law a majority vote was required for election.
 
 
 4
 This suit was commenced by eight black residents of the northern district as a class action. The class consists of all blacks eligible to vote in Montgomery County, and seeks declaratory and injunctive relief on the theory that the scheme imposed by Act 685 unconstitutionally dilutes black voting strength. The defendants include the present members of the County Commission, the County Probate Judge, and the State Attorney General.
 
 
 5
 The district court concluded that the plan established by Act 685 did "operate to minimize or cancel out the voting strength" of the black minority in the county, and held the Act unconstitutional. It then stayed any action on a remedy pending the outcome of this appeal.
 
 
 6
 Much of what we said in David v. Garrison, 553 F.2d 923, 925-928, 930-931 (5th Cir. 1977), is directly applicable to this case. The discussion there forms a necessary backdrop for our decision today. In order to place that analysis in this file, but to avoid burdening the Federal Reporter with repetition, we incorporate here, in an unpublished footnote, a substantial portion of that opinion.[1]
 
 
 7
 As enunciated in David v. Garrison, 553 F.2d at 928, the correct approach to a claim of dilution is to examine the situation in light of the factors identified in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973) (en banc), aff'd per curiam on other grounds sub nom., East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). A conclusory finding by the trial court that there has been dilution is not sufficient. See Nevett v. Sides, 533 F.2d 1361 (5th Cir. 1976). It remains therefore to address each of the factors through which a plaintiff may show dilution. In doing so we keep in mind that while no factual finding may be disturbed unless clearly erroneous, the failure to find facts necessary to support a result is an error of law.
 
 Slating
 
 8
 The first factor which must be addressed is minority access to the slating process. The district court made no findings with respect to the existence or absence of screening organizations, petition requirements, or other barriers to minority group members. It did discuss a number of successful and unsuccessful black candidates for public office. The very fact that there have been such candidacies is "suggestive of the fact that there is minority access to the nomination process." David v. Garrison, 553 F.2d at 929. The court did not, however, make any findings concerning the process through which one may become listed on the ballot, and it is the ability of blacks to get on the ballot which is the core of the inquiry as to slating. Absent such findings, a pausity of black candidates may be caused by a multitude of factors other than an unequal slating process and a diluting at-large system.
 
 Responsiveness
 
 9
 The analysis of the responsiveness question requires a consideration of two distinct problems. The first is the provision of governmental services to minority communities. This is the area in which citizens most typically rely on their local governments for equal treatment. Yet the district court made no findings whatsoever on whether the Montgomery County Commission was presently providing equal services to all communities within the county. The only evidence concerning county services related to the refusal of the Commission to build a football field at a school when it was an all black junior high school with no football team, followed by the construction of such a field when the school was converted to an integrated high school with such a team. This alone seems insufficient.
 
 
 10
 The district court opinion did catalog the long, and certainly undisputed history of official racial discrimination in Alabama in general and Montgomery County in particular, and took judicial notice of a series of desegregation suits concerning Montgomery recreation facilities, buses, bus terminals, libraries, and museums. In each of these cases, however, the County Commission itself was not a party, and there is no indication that the matters involved were within its jurisdiction. Instead, in each instance the lawsuits were concerned with conditions existing within the city of Montgomery and the activities of the city government. Such facts cannot properly bear on the "governmental services" responsiveness inquiry here since they do not deal with matters within the control of the County Commission.
 
 
 11
 The second problem faced in making the responsiveness analysis "concerns the distribution of municipal jobs and appointments to various boards and commissions." David v. Garrison, 553 F.2d at 929. In this regard, the district court noted that
 
 
 12
 (t)he Commission is currently under court order to end racially discriminatory hiring practices. Sims v. Montgomery County Commission, CA No. 3708-N (M.D.Ala. March 22, 1973) . . . . (N)ot only are blacks significantly underrepresented on the County's payroll, but . . . those who are employed are assigned primarily to low-paying clerical and laborer positions. The plaintiffs' evidence also demonstrates that blacks are significantly underrepresented in appointments made by the Commission.
 
 
 13
 Unlike David v. Garrison, the hiring disparity here is indicative of some measure of lack of responsiveness since the prerequisites to a hiring discrimination lawsuit include a showing of intentional refusal to hire otherwise qualified persons by the defendant Commission. This finding alone, however, is not enough. County jobs do not necessarily need to be allocated proportionately to every group in the electorate before a local governmental entity is deemed to be responsive. Hiring disparity is relevant at all only because it is suggestive of the fact that the Commission believes it can treat black citizens unequally with impunity. Such a belief, of course, is in turn a symptom of dilution.
 
 
 14
 As is true of all the Zimmer factors, the inquiry into governmental responsiveness is designed to test whether an at-large system has made elected officials so secure in their positions and has made the black vote so unnecessary to success at the polls that the day-to-day governmental services provided to, and input secured from, all segments of the electorate as a matter of course are being withheld from the black community. The allocation of jobs is only one piece of the puzzle.
 
 State Policy for At-Large Districts
 
 15
 Although motive is not a direct issue in the dilution context, this factor is used by the courts to determine how skeptically a given at-large system should be regarded. In our federal system states can choose those techniques of electing officials which suit their local requirements. The adoption of an at-large scheme in a state which has not often used such a mechanism casts the scheme in a dubious light and indicates that it may be a tool of minority vote dilution.
 
 
 16
 In this regard, the trial court observed: "(T)he multi-member district plan cannot be said to serve any historical policy in Montgomery County. Prior to the enactment of the plan challenged here, the Commission had been elected from single member districts in which candidates were required to reside." The manifestation of a state's policy toward the at-large concept can most readily be found in the sum of its statutory and judicial pronouncements.
 
 
 17
 The at-large scheme in this case supplanted one that was grossly malapportioned among single member districts. When the state enacted the statute which converted the Montgomery County Commission election to the at-large system in 1957, it was worded to apply to counties having a population of not less than 125,000 nor more than 225,000. At that time the only county fitting that definition was Montgomery County. According to the 1950 census, the next larger county, Mobile, had a population of 231,105, thus just escaping the force of the act. When the results of the 1970 census became known, however, it appeared that Madison County had a population of 186,540 and thus would be covered by the at-large statute. In 1971 the Alabama Legislature, by Act No. 1662, amended the statute to limit it to counties having a population of not less than 150,000 nor more than 180,000. At the time Montgomery County had a population of 167,790 and remained the only county in the state affected by this particular statute.
 
 
 18
 On the other hand, Montgomery County is not alone in Alabama in its use of the at-large method of choosing County Commissioners. Some 35 of Alabama's 67 counties use the at-large system to elect Commissioners. See Reese v. Dallas County, 505 F.2d 879, 882 n. 2 (5th Cir. 1974). At least one such system, that in Dallas County, dates back to 1901 when its enactment could not have been designed to dilute the votes of blacks who were thoroughly disenfranchised by more direct means. Laws of Alabama No. 328 (Feb. 8, 1901); see McGill v. Gadsden County Comm'n, 535 F.2d 277 (5th Cir. 1976).
 
 
 19
 There is nothing in the findings of the trial court which chooses among the interpretations which could be placed on this state of affairs. With more than half of the state's counties using at-large voting there would appear to be some state policy involved. Yet the vigilance exercised by the legislature to guarantee that the act here under consideration remains limited to Montgomery County is rather curious. Whether the state policy for multimember districts can be characterized as "tenuous," which is what the plaintiffs must demonstrate under Zimmer, remains an open question. The trial court is in the best position to come to a conclusion as to the true motive underlying the choice for at-large voting.
 
 
 20
 Does Past Discrimination Preclude Present Effective Participation
 
 
 21
 The virtually universal racial discrimination, both private and governmental, which previously existed within our jurisdiction is, of course, unquestioned. Precisely because no area within our Circuit can claim to have been free of discrimination in the recent past, however, a careful assessment must be made of the still lingering effects on any political system scrutinized.
 
 
 22
 The trial court, in the context of its responsiveness discussion, made a thorough survey of the systematic forms of racial segregation which existed in the Montgomery area during the fifties and sixties. The factual question is whether that discrimination precludes effective participation in the electoral system by blacks today in such a way that it can be remedied by a change in electoral systems.
 
 
 23
 The concept of lingering effects of past discrimination was developed in Bradas v. Rapides Parish Police Jury, 508 F.2d 1109, 1112 (5th Cir. 1975):
 
 
 24
 (T)he issue here of course is not whether Rapides Parish discriminated against blacks in the past, but rather whether any debilitating effects of that discrimination still persist. See Zimmer, supra, 485 F.2d at 1306. In previous cases such debilitating effects have usually been shown by a relatively large discrepancy between the size of the black population and the number of registered black voters, . . .
 
 
 25
 The district court here found that only 44.2% of eligible black voters are registered while 83.3% of the eligible whites have registered. This clearly implies that although the population is 36% black, the percentage of voters who are black is significantly smaller. When the findings of the court that the voting in Montgomery County is polarized along racial lines and that no black has ever been elected to the Commission are also considered, it would seem apparent that the system suffers from lingering effects of previous racial discrimination. But this cannot be the sole criteria for changing a political system.
 
 The Other Factors
 
 26
 It is apparent either on the face of the record or from the district court findings that there is a majority vote requirement and that the place-on-the-ballot system precludes single shot voting. These facts support the plaintiffs. It is equally clear that there is a geographical subdistrict requirement, which cuts in the defendants' favor. We know that the district contains 167,000 persons, but we do not know if this is a "large district" in the context of Alabama elections.
 
 The Aggregate of the Factors
 
 27
 In cases such as these, all factors must be considered, and those which imply a nondiluted system cannot be ignored. We thus have a system in which candidate slating is at least arguably open, but in which there are lingering effects of past discrimination, and in which the strength of the state policy for multimember elections and the commission's responsiveness to the needs of the minority are both unclear. We also have the offsetting facts of a majority-place voting system and a geographic subdistrict requirement.
 
 
 28
 With the burden of proof resting on the plaintiffs, there were insufficient facts found, in the light of the cases decided since the district court considered this case, to conclude that the Montgomery County plan was constitutionally deficient. Nonetheless, the serious concern which Judge Johnson had for the legitimacy of this election system, as manifested in his findings, makes it appropriate to remand the case for further proceedings.
 
 
 29
 In each of these dilution cases a federal court is being asked to interject itself into a state-created electoral system and to replace it with a radically different scheme because of supposed constitutional infirmities. Before engaging in such aggressive interference with what has traditionally been regarded as a state function, thorough and detailed findings on each issue that the courts have thus far found to be relevant must be made. To allow conclusory findings that "the government is unresponsive," and that "no black has ever been elected" to substitute for such detail would alter the balance that our constitutional system of federalism is designed to protect. The judgment of the district court is vacated and this cause is remanded for further proceedings consistent with the cases discussed in David v. Garrison and particularly those cases decided since consideration of this case by the district court.
 
 
 30
 VACATED AND REMANDED.
 
 
 
 *
 Senior District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 Unpublished footnote