Claude SONNIER, James H. Guillory, David Coleman, David L. Smith, and Julius Guillory

v.

The MAYOR AND the TOWN COUNCIL OF the TOWN OF VINTON, Louisiana, and its Individual Members.

Civ. A. No. 771437.

United States District Court, W. D. Louisiana, Lake Charles Division.

Feb. 7, 1980.

Louis B. Guidry, Lake Charles, La., for plaintiffs.

Charles C. Broussard, Sulphur, La., for defendants.

VERON, District Judge.

## RULING

This is an action brought by plaintiffs pursuant to 42 U.S.C. § 1973, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201, a preliminary injunction, a permanent injunction and other reliefs to enjoin the deprivation under color of law by the Board of Aldermen and the Mayor of the Town of Vinton, Louisiana, (Vinton) of the rights, privileges and immunities of plaintiffs under the Fourteenth and Fifteenth

Amendments to the United States Constitution.

The jurisdiction of this court is invoked under the provisions of 28 U.S.C. § 1343(3) and (4). This court has personal jurisdiction over the plaintiffs and defendants. Plaintiffs Claude Sonnier, James H. Guillory, David Coleman, David L. Smith and Julius Guillory are black citizens of the United States and residents and registered voters of the Town of Vinton, Louisiana. The defendants are Glen W. Ebarb, Lucien Kibodeaux, Jr., Leroy Semar, Dexter Brown and Kenneth J. Merchant, present members of the board of aldermen and Raywood LeMaire, mayor, of the Town of Vinton, Louisiana.

Plaintiffs allege that the use by Vinton of an at-large electoral system for the selection of town officials, dilutes the votes of the black citizens, in violation of the Fourteenth and Fifteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1973.

The population of the Town of Vinton, as reflected by the 1970 Federal Census (Exhibit P–2) was 3453, of which 2837, or approximately 82% were white and 616, or approximately 18% were black. In January, 1978, whites constituted approximately 86% of the registered voters of the Town of Vinton and blacks constituted approximately 14% (Exhibit P–6).

The governing body of the Town of Vinton is composed of a mayor and five aldermen, all of whom are elected from the town at-large. No black person has ever been elected as mayor or alderman of the Town of Vinton.

An appointment plan is not constitutionally infirm merely because it includes at-large districts. Plaintiffs have the burden to prove that such an electoral scheme unconstitutionally dilutes the votes of minority group members. *See White v. Regester*, 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973); *Zimmer v. McKeithen*, 485 F.2d 1297, 1304–05 (5th Cir. 1973) (en banc), Aff'd on other grounds sub nom.; *Cross v. Baxter*, 604 F.2d 875, 878

(5th Cir. 1979). In *Cross, supra*, the court stated there are four specific areas of inquiry which are particularly important in proving dilution of a minority's vote. They are:

(1) equality of access of minority group members to the political process;

(2) whether past discrimination has the present effect of discouraging minority members' participation in the electoral process;

(3) whether the governmental policy underlying the use of multimember districts is tenuous; and

(4) the responsiveness of the government body in question to the needs of the minority community.

However, the court went on to state that the four areas of inquiry are not exclusive and that the plaintiffs need not prove all four inquiries produce results tending to show unconstitutional discrimination. In addition, it is important that the court consider and weigh other factors to determine if the plaintiffs should prevail. In *McIntosh County Branch of NAACP v. City of Darien*, 605 F.2d 753, 756 (5th Cir. 1979), the Court stated:

[T]he ultimate issue in a voting dilution case is whether an at-large system has the effect of diluting the impact of the minority's voting strength and whether such an impact is intended.

Plaintiffs' principal contentions, in support of their position that the at-large electoral system in Vinton constitutes a dilution of the votes of the black citizens, are as follows:

(1) Blacks, who are the principal inhabitants of the area known as "The Quarters," do not have in-put into the political decision-making process of the Town of Vinton inasmuch as there has never been a black person elected to the governing body of the Town of Vinton, and this contention is based on the following:

(a) Inasmuch as there is only one party, namely the Democratic Party, in the Town of Vinton, nomination by the Democratic Party invariably results in the election of the Demo-

cratic candidate, and the Democratic Party has consistently excluded blacks from its slate of candidates for Town government elective positions;

(b) Inasmuch as all candidates in Vinton run at-large, and not from any particular geographical sub-district, and since no black persons have ever been elected, "The Quarters" does not have a representative who is aware of the particular problems of the area by virtue of living therein;

(c) Voting and registration are carried out on a segregated basis.

(2) "The Quarters" is generally unsanitary and unhealthy because streets and ditches are allowed to remain uncleaned for inordinate periods of time, and trash is allowed to accumulate over an extended period of time;

(3) Black citizens in "The Quarters" must expose themselves to dangers of traffic because there are very few sidewalks in the area;

(4) Streets and sidewalks were poorly lighted;

(5) Public employment of blacks is not proportionate to black population percentage, there being no blacks in any supervisory position and no blacks on the police force;

(6) There is a considerable degree of de facto segregation in connection with the operation of the public housing projects and the *public home for the aged* (*NOTE:* This is believed to be a misunderstanding by plaintiffs inasmuch as there is no such public home in Vinton. The evidence indicated there is a public housing project reserved especially for the aged).

In accordance with the instructions in the *Cross* and *McIntosh* cases, *supra*, the court makes the following findings of fact and conclusions of law:

1.

## EQUALITY OF ACCESS TO THE POLITICAL PROCESS

The only evidence presented by plaintiffs toward discovering whether minority group members are denied equal access to the political process was the testimony of Nathan Taylor, Jr., who (as reflected by Exhibit P–4) was an unsuccessful candidate for election as Alderman in 1973, who stated:

(1) If a person is black and is from Vinton, he is registered to vote in only one precinct; further, if he is from Ward 7 and is black, a person will be registered to vote in only one precinct;

(2) Because black candidates were unsuccessful in 1969 and 1973, blacks in Vinton had a defeatist attitude and did not believe that a black could ever become elected because of at-large voting;

(3) The cost of running for election is a detriment to blacks because of at-large districts;

(4) Since blacks all vote in one precinct, it is easy to determine how they vote, and this can cause a hardship if their candidate does not get elected.

As a consequence of the allegations in (1) above, the registrar of voters was called to testify. Her testimony was that when any person registers to vote, that person is asked where he or she lives, and, if there is any question, is asked to point out the location of their residence on a map (see Exhibit P–5, which is a map showing precincts in Town of Vinton as of April 7, 1964, which precincts have remained unchanged). Her testimony clearly refuted the allegations in (1) above, and her testimony was substantiated by a Deputy in her office. In regard to Exhibit P–7 (being Applications for Voters filed with Registrar of Voters), it is true that one person had a rural route address, but there was no showing by plaintiffs that this was out of the precinct. Further, there was a showing by one witness that he lived outside "The Quarters" but was registered to vote therein; however, it did not appear that he had ever made application to change his voting precinct because of change of address, which is his responsibility and not that of the registrar.

Relative to the allegations in (2) above, it is pointed out that dilution of voting strength is not shown by the fact "that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential." (*See Beer v. United States*, 374 F.Supp. 363 (D.C. D.C.1974); *Parnell, et al. v. Rapides Parish School Board, et al.*, 425 F.Supp. 399 (W.D. La.1976); *Zimmer, supra*). Further, as stated in *Cross, supra*, "the election of a single black official does not mean that the black vote is necessarily not diluted." As reflected by Exhibit D–18, and the testimony of Alderman Semar, the black candidate in the run-off (Guy Davis) in 1973 received a substantial number of white votes. Further, as reflected by Exhibit P–3, the black candidate in 1969 (Willie Tillman, Jr.) received a substantial number of white votes. As a consequence of the foregoing facts, it appears that there is a lack of evidence as to any racial polarization (see Footnote 8 in *Cross*), which is one of the factors which should be considered in denial of access to the political process. In any event, even assuming that the allegations in (2) above are correct, this would not be sufficient to find that the political process in Vinton is not equally open to participation by blacks.

Relative to the contention in (3) above, i. e., the cost of running for office in the Town of Vinton, this appears to be very nominal, based on the testimony. Nathan Taylor, Jr., witness for plaintiffs, did not state how much he had spent in his quest for office, so it is not known what cost is detrimental, as far as he is concerned. However, the testimony of Glyndell Ebarb, an alderman for the past 14 years, indicates that the expenditure by him in his first campaign was $65.00, which included a qualifying fee of $35.00 plus $30.00 for cards; that, in his subsequent election campaigns, he had spent only $35.00 each campaign, $25.00 being for filing fee and $10.00 for an advertisement in the Vinton newspaper. This cost was substantiated by Alderman Brown. Alderman Semar testified that he had spent less than $200.00 for both the first and second primaries, but he did not break his expenses down. Contrary to the allegations of Mr. Taylor, it is refreshing to learn that a political campaign can be conducted on such a low budget. This, in no small part, is possible because of the small size of the Town of Vinton, which factor will be more thoroughly discussed subsequently.

The contention in (4) above that it is easy to determine how blacks vote in Vinton because they all vote in the same precinct appears to be correct. The evidence reflects that the blacks are primarily located in "The Quarters" which is precinct 5 in the voting area. There is no contention made or evidence submitted that the precinct is gerry-mandered or has been formed in such a way as to discriminate against blacks. In view of the facts, such a contention must be considered as lacking in weight.

There was no evidence whatsoever as to any barriers to minority participation in any political process leading to nomination and election, and, more specifically, there was no evidence presented which reflected that blacks had any problems in registering to vote, voting and campaigning for office (other than cost, which has been discussed above). The only requirement to run for office is to file candidacy papers and pay a nominal filing fee to be placed on the ballot. The candidate campaigns for office along with other candidates. There are no formal slating organizations or other barrier preventing black candidates from obtaining places on the ballot.

There was no evidence presented by plaintiffs of any socio-economic inequities which would give rise to a presumption that the disadvantaged minority group does not enjoy access to the political process on an equal basis with the majority. But, assuming that there are economic and educational inequalities, this would not be sufficient, as stated in Footnote 9 of *Cross*, to support an inference of invidious intent, although it might if coupled with evidence of unresponsiveness of elected officials to minority needs. Further, plaintiffs did not prove, as stated in *McIntosh*, that any present socio-economic disparity is the result of any past exclusion of blacks from the process of selecting municipal elected officials.

There was no evidence presented by plaintiffs that any past discrimination because of state laws had any lingering effect so as to deny blacks equal access to the political process, nor was any evidence presented that present laws do so. In fact, plaintiffs' brief admits that there is no evidence that de jure segregation exists today in Vinton. The plaintiffs' brief does contend that de facto segregation exists today in connection with public housing projects, and this issue should apparently, as this court understands Footnote 4 of *McIntosh*, be considered at this point.

In connection with the issue of de facto segregation in public housing, one of plaintiffs' witnesses (Nathan Taylor, Jr.) stated that public housing was used totally to promote segregation. Another witness for plaintiffs testified that she had had her application for public housing in for a number of years. Another testified that she did not know why her application was not accepted.

The testimony of Thomas Guillory, a black person who is a member of the Board of Directors of the Housing Authority of the Town of Vinton, testified that the housing project on Eddy Street was totally black, as was the housing project on Horridge Street; that the housing project on Center Street was totally white, and that the housing project on Krippse Drive was 60% black and 40% white. He further testified that Billy Stinson, employed by the Housing Authority Board to administer and direct the housing program in the Town of Vinton, selected tenants as he desired, giving the inference that he discriminated against the blacks. Upon cross-examination, however, he admitted that there was a policy which had been formulated and was utilized in connection with the admittance of tenants to low-rent housing.

Mr. Stinson testified that his duty, as Executive Director of the Housing Authority, was to place tenants in housing projects who would not be a cause of trouble, especially if they were known trouble-makers, and that he was guided by an admissions policy in connection with placing tenants.

He further testified that the person who had been waiting for so long for a house had moved away from Vinton and, after trying to contact her, he took her application out of the file, in accordance with his procedure. Of paramount importance, however, to the question at issue, was that blacks had turned down apartments in the white project, that he had documents in his file to prove this and that his policy was not to manage projects to bring about segregation. He further explained that the project on Center Street was for the elderly, and consisted of mainly one-bedroom apartments, and that under the admittance policy, if a person had children of opposite sexes, and they were of a certain age, it was necessary that the applicant receive a three-bedroom apartment, i. e., one-bedroom for each sexed child and one for the parent(s).

It further developed from the evidence that a complaint had been filed with Housing and Urban Development, which is responsible for the overall administration of low-rent housing projects, and that, as a consequence thereof, an investigation was made, and as testified to by Mr. Stinson, and corroborated by the mayor, no irregularities were found.

Although it is true that the Housing Authority is an independent board, appointed by the mayor with the consent of the board of aldermen of the Town of Vinton, the mayor and aldermen named as defendants, in a voting dilution case, would be held accountable if the housing authority permitted discrimination to exist. It is pertinent, therefore, to state that the mayor, after becoming cognizant of the complaint, actively concurred in the request for an investigation by HUD and, after the investigation disclosed no irregularities, was satisfied with the operation of the Housing Authority, and the fact that discrimination was not being practiced.

2.

### PRESENT EFFECT OF PAST DISCRIMINATION

No evidence was presented by plaintiffs relative to past racial discrimination.

Plaintiffs must bear the burden of proving that there are present effects of past discrimination.

Although no evidence was presented, the court feels constrained to point out that, because of the laws of the State of Louisiana for many years, blacks were unable to vote. As said in *Cross*, at page 881, "The mere removal of past official discrimination does not render the present effects of that discrimination irrelevant in determining whether an electoral scheme dilutes the votes of the minority."

In looking at this issue, and analyzing the information submitted by the registrar of voters (Exhibit P–6), it appears that blacks composed 16.99% of registered voters of the Town of Vinton in 1969, 15.61% in 1973 and 14.39% in 1978. The decrease in percentage results mainly from the growth of white registered voters, rather than from lack of registration by blacks. Inasmuch as population figures were not presented except for the year 1970, it is not known whether the increase in growth of white registration is the result of growth of white population or increased white voter registration. In any event, it does not appear that there is any past pervasive discrimination so as to exhibit a present disproportion in voting registration and voting, inasmuch as, based on the 1973 voter registration (Exhibit P–6), and based on 1973 voting (Exhibit D–18), it appears that 65.20% of the registered black voters voted in the 1973 election; by comparison, it appears that only 43.69% of registered white voters voted in the 1973 election.

### 3.
### GOVERNMENTAL POLICY REGARDING AT–LARGE DISTRICTS

The Town of Vinton was incorporated as a Village in 1910 under the Lawrason Act, which was adopted in 1898, which set forth the general legislative charter for municipalities, and is now found in LSA–R.S. 33:321, et seq. This law does not favor or disfavor at-large voting. Under the provisions of LSA–R.S. 33:382, a town can be divided into wards, but if not so divided, it shall be treated as constituting one ward—and thus have at-large elections.

As was said in *McIntosh* at p. 760:
> The purpose of the *Zimmer* inquiry into the policy underlying the use of at-large districts is to determine whether the system was instituted or continued with the intent to dilute the minority vote. If no inference of such invidious intent can be drawn, no weight should be placed on the results of this inquiry.

The Town of Vinton has always operated under the at-large system, and it was not instituted or continued with the intent to dilute the minority vote. This case is not analogous to *Zimmer*, where a long tradition against at-large districts was reversed shortly after large numbers of blacks began to vote, and thus state policy cannot be said to be "tenuous" in the instant case.

### 4.
### RESPONSIVENESS TO NEEDS OF MINORITY COMMUNITY

Again, quoting from *McIntosh* at p. 759:
> Perhaps the most sensitive and difficult inquiry a district court must conduct under *Zimmer* is whether the elected officials in question are unresponsive to the minority needs. The evidence relevant to this question is likely to be hotly disputed and wideranging, so that the appellate court's need for detailed findings of fact and conclusions of law under Rule 52(a) is acute. * * *

In the instant case, plaintiffs seek to show unresponsiveness on the part of elected officials to their needs in the following aspects:

(a) Streets and ditches situated in "The Quarters" are allowed to remain uncleaned for inordinate periods;

(b) Trash is allowed to accumulate over an extended period of time in "The Quarters";

(c) Sidewalks are lacking in "The Quarters," thus rendering it necessary for black citizens living therein to expose themselves to dangers of traffic as a result of having to travel along the side of the street;

(d) Streets and walkways are poorly lighted;

(e) Public employment of blacks is not proportionate to the black population percentage, and there are no blacks in any supervisory position; further, there are no blacks on the police force of the Town of Vinton;

(f) Although not mentioned in plaintiffs' brief, plaintiffs introduced testimony to show that

(1) Vacant lots are not properly cleaned in "The Quarters";

(2) Very rarely do the police patrol "The Quarters", and if a policeman is seen in "The Quarters" something must be wrong;

(3) On Mill Street in "The Quarters" water remains in a ditch and there is a terrible odor of sewage;

(4) Elected officials never meet in "The Quarters" to discuss the problems of the minority; that in order to see an elected official it is necessary to go across town to see him at his home or to see him at a Council meeting.

With respect to (a), plaintiffs submitted testimony that ditches in "The Quarters" were cleaned only once or twice a year, resulting in poor drainage. In response thereto, the defendants presented evidence that a town-wide drainage ditch cleaning program was begun in 1975 in the Northeast section of town (i. e., "The Quarters"), with parish equipment and operators being utilized under a joint-service agreement on weekends, the program having recently been completed. General maintenance such as weed cutting was done on a continuous basis. Some problems had existed with regard to drainage in "The Quarters," inasmuch as the ditches were not on a correct grade, but these problems have been resolved. Apparently, some of the problems with drainage resulted from the accumulation of beer cans, trash and other debris being thrown into the ditches; one witness for plaintiffs testified that he himself had cleaned the ditch of such trash and debris in front of his house. The Town of Vinton has no street cleaning machine and streets throughout the town are not cleaned by the town.

Relative to (b), plaintiffs submitted testimony to the effect that trash in the white section of town would be picked up regularly, whereas trash in "The Quarters" would remain longer. It appears that the trash referred to was of a "commercial" nature, being derived from repairing or renovating a house. This witness did not state whether he had paid the fee and received a permit, as required by Town Ordinance, for "commercial" trash such as he had. The town has a regular trash pickup that is done by two trucks, which travel a regular route that covers the entire town. The isolated instance complained of, (the commercial trash) even if the defendants had notice thereof, does not militate against the overall quality of the garbage and trash pickup service in "The Quarters."

With regard to (c), it does appear that there are few sidewalks in the minority area, just as there are few sidewalks throughout the rest of the town. The sidewalks in the minority area were constructed basically in connection with federal housing projects, whereas those sidewalks in the rest of the town were constructed by the town and paid for by the property owners. The evidence shows that there is a greater percentage of streets with sidewalks in the minority area (i. e., 20%) than in the remaining area (i. e., 12.5%).

Although it is not sufficient to answer the question of unresponsiveness to needs of the black community by saying that the town is also unresponsive to the white community (see *McIntosh*, p. 866), it is sufficient in the instant case to show that in truth and in fact the minority area has a greater percentage of sidewalks to streets than does the white area, and thus defendants should not be held as being unresponsive to the need of the minority community in this respect.

Relative to (d), evidence was presented by plaintiffs that the streets were poorly lighted in "The Quarters," before the institution of these proceedings, with a light being on

each corner; that since the institution of suit a light has been installed in the alley between Horridge and Eddy streets. The additional lights were explained by defendants by showing that certain circumstances peculiar to the area required that they be installed (i. e., mobile homes were moved in). The reason that there is more lighting in the white area of town is the fact that there are so many rented lights, which are paid for by the individual property owners, with there being only one rented light in "The Quarters." The amount of lights furnished by the town in "The Quarters" was greater on a per block basis than that furnished throughout the rest of the town on a per block basis.

Relative to (e), the evidence clearly reflects that there are blacks employed by the Town of Vinton, none in a supervisory capacity. Two blacks have served as policemen in the past, one resigned for a better paying job and the other died. At the time of trial, one black was hired as a policeman, his employment having been the result of the resignation of a policeman prior to trial. There are a total of 4 policemen on the force at this time, in addition to the chief of police. The normal force consists of 5 to 6 policemen. The evidence also established that the town was trying to hire additional qualified policemen, regardless of color.

In connection with supervisors, it appears that the Town of Vinton has only three persons in a supervisory capacity, these being the superintendent of public works, the town clerk (who manages office personnel in the city hall) and the chief of police. There is very little turnover in supervisory personnel, the chief of police being an elected official, and the superintendent of public works and the town clerk having been employed for many, many years (30 and 17 years respectively). The evidence further reflects that the turnover in personnel in the city hall is negligible, there being no opportunity for employment of blacks or anyone else. At the time of the application of one black, who had three months' employment experience in Houston, for a job in city hall, there were no openings because a CETA employee, who had previously been employed by a bank, was doing certain work, and the CETA employee was subsequently hired by the town because of her qualifications and previous experience. A black, who had applied for a job as a policeman, was considered unsatisfactory by the chief of police, because of physical condition and moral character, who recommends the hiring of policemen to the mayor and board of aldermen, and he was not hired. The chief of police testified that it was immaterial to him as to the color of a person if he met certain qualifications and would be deemed to be a good policeman. The superintendent of public works stated that he had advertised in several newspapers and had sought the employment of any qualified person, regardless of color, for the electrical department, and that no blacks whatsoever had applied. There are 9 employees in service maintenance department, four of whom are black. The weight of the evidence appears to be that, if an opening exists, defendants seek to secure qualified employees, regardless of race or color, and that there is no discrimination in their hiring practices. With regard to the contention that public employment of blacks is not proportionate to the black population percentage, *Cross*, at page 884 holds that a mere statistical disparity cannot establish a constitutional violation in constitutional cases. Further, in the instant case, there was no showing of past intentional discrimination relative to hiring practices which resulted in so few blacks being employed by the defendants.

Relative to (f)(1), it appears that the cleaning of vacant lots throughout the Town of Vinton is done under private contract after compliance with certain laws relative to notice to the property owners requiring that their property be cleaned, with weeds and other growth being cut. One of the witnesses for plaintiffs, a private contractor, testified that vacant lots were not cleaned in "The Quarters." It does not appear that requests were made to defendants to comply with the law in connection with giving notice to property owners and the subsequent cleaning of said lots

under private contract, the charge for which is assessed to the property owners.

Relative to (f)(2), the testimony by one of the witnesses for plaintiffs that very rarely were police patrol cars seen in the black area was disputed by the chief of police. He stated that before becoming chief of police, he had patrolled the area on regular patrol several times during his shift, and that, as chief of police, although he did not patrol normally, he was assured by the policemen that they were patrolling the area. This was borne out by the mayor, who periodically rides with a policeman on patrol to determine what is going on in the town, and by one of the aldermen, who acts as liaison for the police department with the mayor and board of aldermen, and who, before the practice was curtailed because of possible liability problems, often rode with a policeman on patrol.

Relative to (f)(3), contrary to the testimony of witnesses for plaintiff, it appears that the problem at the corner of Mill and Eddy Streets was not a sewerage problem, inasmuch as the contents of the ditch had been tested, but that the water in the ditch came from farther away where a water line was leaking and that the odor resulted from the grass and weeds decaying in the ditch. The water line was replaced and the problem solved.

Relative to (f)(4), plaintiffs never testified nor was any evidence submitted that they had requested elected officials to meet in "The Quarters" to discuss the problems of the minority. Although, from a political point of view, it may be desirable for elected officials to have meetings in each part of town, including "The Quarters," to determine the needs of the people, someone has to ask and set the meeting up. Further, there is no necessity for this when the regular town meeting gives all residents an opportunity to air and express their opinions and problems, and each elected official is as close as his telephone. One of the aldermen testified that during the course of his work, he is often in "The Quarters" and that he is attuned to the residents' needs through discussions at work, as well as at meetings of the town officials and also through telephone conversations. The statement that elected officials only go into "The Quarters" during election time is selfdefeating, because "[i]t is characteristic of representative democracy that elected officials are sensitive to the concerns of the voters at least in part because they want to receive votes when they run for reelection." *See Cross*, page 884.

In a further effort to reflect the procedure for maintaining streets, and to offset any negative testimony by plaintiffs as to discrimination, defendants presented evidence showing the streets which had been hard-surfaced (Exhibit D–1) and streets which had been re-surfaced (Exhibit D–2). The paving of streets designated as Project V–1 was done in 1955. No streets were included in "The Quarters" for the reason that the property owners did not desire to have the streets hard-surfaced at that time, this being a voluntary program wherein the property owners were assessed on a frontfoot basis for the cost of the hard-surfacing. Subsequently, however, in Project V–2, streets were hard-surfaced in "The Quarters." Testimony presented by defendants in connection with Exhibit D–2, relative to re-surfacing of streets, reflects that the streets to be re-surfaced were chosen based on the recommendations of the engineer for the Town of Vinton, and that, federal general revenue sharing funds were committed and utilized for said work. The thrust of this testimony and evidence was to show that the Town of Vinton had proceeded in an orderly manner in seeking to maintain its streets, based on engineering recommendations, and that public notice was given and hearings had been held relative to the expenditure of federal general revenue sharing Funds in accordance with law.

In a further effort to show the responsiveness of the elected officials to the needs of the minority community, defendants presented evidence (Exhibit D–17) of an attempt to secure $500,000.00 in "Block Grant Funds," which were to be utilized in the great part in renovating and rebuilding the residences in "The Quarters," together

with sidewalks in the area and re-surfacing of streets. This grant was not received and the Town of Vinton re-applied the following year for the same grant, but again did not receive the grant.

### 5.
### ENHANCING FACTORS

Under Louisiana law, it is necessary that a candidate receive a majority of votes cast in the first primary in order to be elected to office; failure to so do results in another election or a run off. This requirement apparently originated because of the two-party system,[1] and was not instituted for the purpose of discouraging minority participation.

As a consequence of the adoption of the Election Code by the State of Louisiana in 1976, there is now no anti-single shot voting in the State of Louisiana (see Exhibit D–3), and a voter may vote for only one candidate where more than one is to be elected, and his vote will still count.

There are no geographic subdistricts in the Town of Vinton, but this is inconsequential in view of the smallness of the town.

In a small electorate, the plaintiffs must show facts that overcome what would seem to be apparent—that candidates with only modest support could wage an effective campaign in which the merits of their candidacy could be amply exposed to the voters.

*David v. Garrison,* 553 F.2d 923, 929 (5th Cir. 1977). As borne out by the evidence, the time, money and number of persons needed for a campaign in a small electorate such as Vinton is negligible for one who wants to get out and campaign for office.

Another issue which should perhaps be addressed is whether the standard of proof between statutory and constitutional claims should be distinguished, inasmuch as plaintiffs do claim that defendants are in violation of 42 U.S.C. § 1973. *See* Footnote 1 in *McIntosh,* where the court held this was not

a question to be decided. As pointed out in the footnote, however, this issue is now before the United States Supreme Court in the case of *Bolden v. City of Mobile,* 571 F.2d 238, 242 n.3 (5th Cir. 1978), prob. jur. noted, 439 U.S. 815, 99 S.Ct. 75, 58 L.Ed.2d 106 (1978), set for reargument, 441 U.S. 930, 99 S.Ct. 2048, 60 L.Ed.2d 658, reargued October 29, 1979 and awaiting opinion.

As this court understands the issue, the question is whether invidious intent is required under the statutorily-based cause of action (*see* Footnote 2, *McIntosh*). The court finds that no intent, invidious or otherwise, has been shown by plaintiffs which would be sufficient to show dilution of voting on constitutional grounds or on the statutorily-based cause of action.

### FINDINGS OF FACT
### 1.

Plaintiffs are black citizens of the United States and registered voters in the Town of Vinton, Parish of Calcasieu, and the State of Louisiana.

### 2.

Defendants are the present members of the board of aldermen and mayor of the Town of Vinton, Louisiana.

### 3.

The five members of the board of aldermen of the Town of Vinton have been elected on an at-large basis since the Town of Vinton was incorporated as a village in 1910 and received its "Home-Rules" charter. The charter does not require that each member of the board of aldermen reside in a particular area of the town.

### 4.

The Town of Vinton has always operated under the at-large system.

### 5.

Blacks are the principal inhabitants of an identifiable area in the town, which is commonly referred to as "The Quarters."

---

1. As a result the adoption of the Election Code in 1976, Louisiana now has open primaries in which candidates from all political parties participate in one primary election, and if no-one receives a majority of the votes cast, a general election is held between the two candidates receiving the greatest number of votes.

**156**

**6.**

For all practical purposes, with regards to the election to membership of the board of aldermen of the Town of Vinton, nomination by the Democratic Party, at least up until the date of the trial of this matter, always resulted in the election of the democratic candidate.

**7.**

From the time of the incorporation of the Town of Vinton to the present, no blacks have been elected to the board of aldermen.

**8.**

All of the aldermen are white and none of them reside in "The Quarters."

**9.**

Black candidates were candidates for board of aldermen in 1969 and 1973. In 1969, Willie Tillman received 532 votes, and in 1973 Guy Davis was in a runoff and received 574 votes in the runoff, losing by only 11 votes.

**10.**

Total registered voters in Vinton as of:

|  | Whites | Blacks |
|---|---|---|
| January, 1969 | 1583 | 324 |
| January, 1973 | 1909 | 353 |
| January, 1978 | 2034 | 342 |

The population of the Town of Vinton, as reflected by the 1970 Federal census, was 3453, of which 2837 were white and 616 were black.

**12.**

Based on the above figures as to registered voters and census figures, 1970 indicates that 56% of whites were registered to vote and 53% of blacks were registered to vote.

**13.**

Voters are registered to vote and placed in the precinct within the boundary of their residence. No voters were registered to vote in a precinct different from their residence. If a voter changes his residence, it is incumbent on him to notify the registrar of voters so that his voting precinct will comply with his residence.

**14.**

The cost of running for a seat on the board of aldermen ranges from a minimum of $35.00 to a maximum of $200.00 for a total campaign.

**15.**

There are no barriers to blacks registering to vote, voting or running for political office. In order to run for office, all one has to do to get on the ballot is pay a nominal filing fee of $25.00.

**16.**

There was no evidence presented to support an inference of invidious intent on the part of the defendants. While no evidence of socio-economic inequities was offered, the court recognizes that this factor, to a limited degree, was present, but this factor did not show that the public officials were unresponsive to the minority needs.

**17.**

The evidence established that public housing in Vinton has 2 units with only black occupants, and 2 units with only white occupants, and 1 unit with 60% black and 40% white occupants. A complaint was filed, and HUD investigated and found no irregularities in the operation by the Housing Authority in the Town of Vinton.

**18.**

For many years, blacks were not permitted to vote. This situation no longer exists. Based on the 1970 Federal Census, blacks comprised approximately 18% of the total population of Vinton. In 1969, blacks comprised 16.99% of the registered voters; in 1973, blacks comprised 15.61% of the registered voters and in 1978 they comprised 14.39% of the registered voters. In the 1973 election, it appears that 65.20% of the registered black voters voted and by comparison only 43.69% of registered white voters voted. There is no evidence that blacks have any impediments to registering, voting or running for office.

**19.**

The at-large system has been in effect since 1910, long before blacks were allowed to vote in Louisiana.

**20.**

The Town of Vinton furnished the same services to all parts of the town concerning the streets and ditches. There was one instance where commercial trash was not picked up within a reasonable period of time. There are more sidewalks on a percentage basis in "The Quarters" than other areas. The amount of street lights furnished by the town is equal or better for the black area. Blacks are employed by the town but none in a supervisory capacity. There are only three supervisory people, one of which is elected by the voters, the chief of police. The other two are the town clerk and the superintendent of public works. These two have occupied these positions for a number of years. The town has attempted to hire workers of all races in the electrical department, but has been unsuccessful. Because of the finances of the town and the location near many industrial plants, the city has difficulty in securing qualified personnel because it is unable to meet the pay standards of private industry.

**21.**

The police department patrols all areas of the town, consistent with the amount of its personnel.

**22.**

The hard-surfacing of streets reflect that the public officials are cognizant of and have responded to the needs of "The Quarters." In addition, the Town of Vinton has attempted to secure federal grants of $500,-000.00 on at least 2 occasions, to be used exclusively in "The Quarters" to install additional sidewalks, re-surface streets and renovate and rebuild residences.

**23.**

Louisiana outlawed anti-single shot voting in 1976; thus a voter may vote for only one candidate and still have his vote count.

**24.**

The Town of Vinton is a small geographic area, and it is no problem to campaign in the entire area. There is a weekly newspaper in the town.

**CONCLUSIONS OF LAW**

**1.**

This court has jurisdiction under the provisions of 28 U.S.C. § 1343(3) and (4).

**2.**

The minority members of the Town of Vinton have equal access to the political process.

**3.**

Past discrimination does not have any present effect of discouraging participation by minority members in the political process.

**4.**

The use of at-large district by the Town of Vinton is not rooted in racial discrimination.

**5.**

The government of the Town of Vinton has been and is continuing to be responsive to the needs of the minority community.

**6.**

In support of the above, see *White v. Regester, supra; Zimmer v. McKeithen, supra; Cross v. Baxter, supra;* and *McIntosh County Branch of the NAACP v. City of Darien, supra.*